**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
*Southern Division*

|  |  |
|---|---|
| | * |
| **UNITED STATES OF AMERICA** *ex rel.,* | |
| **BUNTING GRAPHICS, INC** | * |
| | |
| *Plaintiff,* | * |
| | |
| **v.** | * |
| | |
| **MANHATTAN HUNT, A JOINT** | * |
| **VENTURE,** | |
| | * |
| *Defendant.* | |
| | * |

**Case No.: 16-cv-2980-PWG**

\* \* \* \* \* \* \* \* \* \* \* \* \* \*

**MEMORANDUM OPINION**

Before the Court are the parties' cross motions for summary judgement. This case originated out of a subcontract dispute between Plaintiff United States of America, ex. rel., Bunting Graphics, Inc. ("Bunting") and Defendant Manhattan Hunt, A Joint Venture ("MHJV"). MHJV hired Bunting to perform metal fabrication and installation services during construction of a new Ambulatory Care Center and replacement Dental Clinic at Andrew's Air Force Base in Prince George's County, Maryland ("Project"). Compl. ¶ 13, ECF No. 6. The parties completed discovery on November 29, 2019 and proceeded to file cross motions for summary judgment. Bunting argues that MHJV cannot show that its decision to terminate Bunting from the Project for default, rather than for convenience, was legally justifiable. MHJV, on the other hand, argues that it is entitled to partial summary judgment on the issue of termination because its decision to terminate Bunting was indisputably justified under Maryland law. The parties fully briefed the

motions (ECF Nos. 82, 85, 90, 91) and a hearing is not necessary.  *See* Loc. R. 105.6 (D. Md. 2018).  For the reasons that follow, Bunting's motion is denied and MHJV's motion is granted.

## Factual Background

Bunting, a Pennsylvania company based in Verona, PA, entered into a contract with MHJV, which is based in Tulsa, Oklahoma, in July 2013 to perform miscellaneous metal fabrication and installation at the Andrews Air Force Base Project. Compl. ¶¶ 4, 5, 13.  The contract's value exceeded $3,000,000.  *Id*. ¶ 13.  Bunting claims that MHJV directed it to perform additional work and has yet to compensate Bunting for the value of that work, which exceeds $190,000.  *Id*. at 24.  In total, Bunting alleges MHJV owes Bunting $1,163,985.02.  *Id*. ¶ 28.  The non-payments were an issue during "Phase I" of the project when MHJV ceased making payments to Bunting, which resulted in Bunting sending MHJV a notice of default due to nonpayment on June 23, 2015.  *Id*. ¶¶ 39, 40.  Bunting continued its work and Phase I of the project reached "Beneficial Occupancy," or BOD, on February 26, 2016.  *Id*. ¶ 44.  According to Bunting, all that remained for it to complete was "very minor punchlist work."  *Id*. ¶ 46.  Bunting alleges it had completed 99% of its subcontract work on March 17, 2016 when MHJV terminated the contract for default.  *Id*. ¶ 47.  Bunting brought this suit seeking to convert the termination for default to termination for convenience, which would entitle it to costs plus reasonable overhead and profit.  Bunting's complaint against MHJV asserts a breach of contract claim and an alternative claim for unjust enrichment.

MHJV, on the other hand, views the facts quite differently.  According to the statement of facts in MHJV's cross motion, at the end of Phase 1, MHJV discovered that Bunting provided improper materials for several of its performance obligations under the terms of the parties' agreement.  Def.'s Opp. & Cross Mot. 4, ECF No. 85-1.  According to MHJV, it confronted

Bunting about the issues and, in accordance with the parties' agreement, demanded that Bunting cure the issues MHJV discovered.  *Id*.  Bunting declined to do so, and MHJV terminated Bunting for default.  *Id*.

*The Parties' Agreement*

The contract at issue here is attached as Exhibit A to Bunting's motion for summary judgment.  Throughout their briefs, the parties reference several important clauses of the contract, and I find it would be worthwhile to note those provisions here.

Section 1.3, titled "The Work" describes the scope of Bunting's obligations under the contract, such as its obligation to perform and furnish all supervision, labor, and materials "necessary for the construction and completion of the work . . . ."  Ex. A to Pl.'s Mot. at 4, ECF No. 82-2.  Importantly, § 1.3 requires that the work described in the subcontract and all work "incidental thereto or reasonably inferable therefrom, [be] in strict accordance and in full compliance with the terms of the Contract Documents."  *Id*.

Section 2.4.1 addresses the subcontractor's liability and made Bunting responsible and liable for all work, supervision, labor, and materials.  It charged Bunting with prosecuting "the Work in a good and workmanlike manner, with diligence and continuity."  *Id*. at 6.  And, particularly relevant to the issues here, stated "[i]n the event of any loss, damage or destruction thereof from any cause, subcontractor shall be liable therefore, and shall repair, rebuild and make good said loss, damage or destruction at Subcontractor's cost."  *Id*. at 6.  The next section, § 2.4.2, made Bunting liable to MHJV for all costs MHJV incurred as a result of Bunting's failure to perform.  *Id.* at 7.

Section 2.13.1 is titled "Inspection and Acceptance."  It charged Bunting with promptly replacing or correcting "any Work or materials which MHJV or the Owner shall reject as failing

to conform to the requirements of this Subcontract.  If Subcontractor does not do so within the

time required by the Contract Documents . . . MHJV shall have the right to do so and Subcontractor

shall be liable to MHJV for the cost thereof."  *Id*. at 10.

Section 3.3, "Continuing Contract Performance," required Bunting to "proceed diligently

with performance of its Work and [to] follow any decision by MHJV with respect to the dispute

until final resolution."  *Id*. at 11.

Section 9.1 is perhaps the most important contract provision for the issues present here.  It

reads

> [i]f, in the opinion of MHJV, Subcontractor shall at any time (a) refuse or fail to
> provide sufficient properly skilled workers, adequate supervision or materials of
> the proper quality, (b) fail in any material respect to prosecute the Work according
> to MHJV's current schedule, (c) cause, by any act or omission, the stoppage or
> delay of or interference with the Work of MHJV . . . (d) fail to comply with any
> provision of this Subcontract or the Contract Documents . . . then, after serving
> forty-eight (48) hour written notice . . . unless the condition specified in such notice
> shall have been eliminated within such forty-eight (48) hours, MHJV, at its option,
> without voiding the other provisions of this Subcontract and without notice to the
> sureties . . . may (i) take such steps as are necessary to overcome or correct the
> condition (including supplementing the work of Subcontractor), in which case the
> Subcontractor shall be liable to MHJV for the cost thereof [or] (ii) terminate for
> default Subcontractor's performance of all or a part of the Subcontract Work . . . .

*Id*. at 17.

Section 9.2 barred any further payment to Bunting in the event MHJV exercised its rights

under § 9.1 until the Work was fully completed and accepted by the Owner.  Section 9.3 provided

Bunting with a remedy in the event MHJV wrongfully exercised its option to terminate for default.

Wrongful termination for default, under the contract, would be converted to termination for

convenience, which would entitle Bunting to certain compensation specified in § 10.  *Id*.  That

compensation would include "the reasonable value of the Work performed by [Bunting] prior to

termination plus reasonable direct close-out costs, including job site overhead and profit on Work

4

performed, but in no event [would] Subcontractor be entitled to unabsorbed overhead, anticipatory profit or damages of any kind or nature, direct or indirect, incidental or consequential." *Id*. at 18.

### Standard of Review

Summary judgment is proper when the moving party demonstrates, through "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . admissions, interrogatory answers, or other materials," that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a), (c)(1)(A); *see Baldwin v. City of Greensboro*, 714 F.3d 828, 833 (4th Cir. 2013). "A disputed fact presents a genuine issue 'if the evidence is such that a reasonable jury could return a verdict for the non-moving party.'" *Cole v. Prince George's Cnty.*, 798 F. Supp. 2d 739, 742 (D. Md. 2011) (*quoting Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

If this initial burden is met, the opposing party may not rest on the mere allegations in the complaint. *Anderson*, 477 U.S. at 247–48. Rather, the burden shifts to the nonmoving party to identify evidence showing that a genuine dispute exists as to material facts. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–87 & n.10 (1986). The existence of only a "scintilla of evidence" is not enough to defeat a motion for summary judgment. *Anderson*, 477 U.S. at 251–52. Instead, the evidentiary materials submitted must show facts from which the finder of fact reasonably could find for the party opposing summary judgment. *Id.* Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, summary judgment is appropriate. *Id.* at 248–49.

In reviewing the evidence related to a motion for summary judgment, the Court considers the facts in the light most favorable to the non-moving party if there is a genuine dispute as to

those facts. *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009); *George & Co., LLC v. Imagination Ent. Ltd.*, 575 F.3d 383, 391–92 (4th Cir. 2009); *Dean v. Martinez*, 336 F. Supp. 2d 477, 480 (D. Md. 2004). And the Court may not make credibility determinations when assessing contradictory testimony or affidavits. *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 645 (4th Cir. 2002). The Court must, however, also abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 526 (4th Cir. 2003) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 1993), and citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986)).

"On cross motions for summary judgment, 'each motion [is] considered individually, and the facts relevant to each [are] viewed in the light most favorable to the non-movant.'" *Lynn v. Monarch Recovery Management, Inc.*, No. WDQ-11-2824, 2013 WL 1247815, at *1 n.5 (D. Md. Mar. 25, 2013) (quoting *Mellen v. Bunting*, 327 F.3d 355, 363 (4th Cir. 2003)). "Cross motions for summary judgment 'do not automatically empower the court to dispense with the determination whether questions of material fact exist.'" *Equal Rights Center v. Archstone Smith Trust*, 603 F. Supp. 2d 814, 821 (D. Md. 2009) (quoting *Lac Courte Oreilles Band of Lake Superior Chippewa Indians v. Voigt*, 700 F.2d 341, 349 (7th Cir. 1983)). Rather, the Court considers "each motion separately on its own merits to determine whether either of the parties deserves judgment as a matter of law." *Defenders of Wildlife v. N. Carolina Dep't of Transp.*, 762 F.3d 374, 392 (4th Cir. 2014) (quoting *Bacon v. City of Richmond, Va.*, 475 F.3d 633, 638 (4th Cir. 2007)).

## Discussion

*MHJV's Motion*

In its cross motion, MHJV argues it is the party entitled to summary judgment regarding the decision to terminate Bunting. MHJV seeks partial summary judgment on only the termination dispute and asks me to set this case for trial as to the matter of damages. The standard for

termination of a subcontractor, MHJV argues, is the "reasonable man" standard.  Substantial performance (the basis of Bunting's argument for summary judgment that I discuss below) has no bearing on the issues here.  Def.'s Opp. & Cross Mot. 17.  The "reasonable man" standard comes from *Warren-Ehret*, which stated a contractor's decision to terminate a subcontractor would be upheld unless it was arbitrary and capricious.  *First Nat. Realty Corp. v. Warren-Ehret Co.*, 233 A.2d 811, 815 (Md. 1967).  MHJV argues the facts here do not give rise to any inference that its decision to terminate was arbitrary and capricious; rather, the reasons stated in the termination letter were supported by "competent, material, substantial, and undisputed evidence."  Def.'s Opp. & Cross Mot. 22.  The contract between the parties required strict compliance and Bunting—on numerous occasions—both deviated from that requirement and attempted to conceal its unauthorized substitutions.  *Id*. (citing Ex. A to Pl.'s Mot. at § 1.3).

As MHJV explained in its letter terminating Bunting for default, Bunting failed to 1) supply sufficient manpower; 2) install the correct type of rails leading from the Ambulatory Care Center to the parking garage;[1] 3) properly install rails attached to shear walls in the parking garage, having used Tapcon screws instead of screws with a larger diameter and deeper penetration into the concrete wall; and 4) properly install dental light supports in exam rooms.  Ex. 7 to Def.'s Mot. 2–3, ECF No. 85-8.  These deficiencies are detailed in both the termination letter and in affidavits from Ted Baker, the Project Director for MHJV, and Philip Mack, the Project Executive.  Baker's affidavit notes Bunting's failure to properly install the parking garage rails and light supports, Ex. 1 to Def.'s Mot. ¶ 7, ECF No. 85-2 (hereinafter "Baker Aff."), as well as Bunting's failure to both acknowledge the shortcomings and correct the work, *id*. ¶ 8.  Baker also detailed the shortcomings of the plaza rail, explaining that it stated to rust and the paint to peel after installation, *id*. ¶ 16, and

---

[1]     The parties refer to this as both the plaza rail and the bronze rail.

of the Tapcon screws used on the garage rail, with their smaller diameter and lesser penetration than what was previously approved, *id* ¶ 19, 21.  Mack offered similar information, stating Bunting refused to fix both the plaza rail, Ex. 3 to Def.'s Mot. ¶ 24, ECF No. 85-4 (hereinafter "Mack Aff."), and the Tapcon screws, *id.* ¶ 30.  Further, MHJV states it gave Bunting opportunities to cure the issues that triggered its termination, but Bunting declined.  Def.'s Opp. & Cross Mot. 22–23; Ex. 4 to Def.'s Mot, ECF No. 85-5 (Notice to Cure Plaza Railings); Ex. 6 to Def.'s Mot., ECF No. 85-7 (Notice to Cure Shear Wall Expansion Anchors).  MHJV also cites deposition testimony from Joshua Bunting, Bunting's President, stating his opinion that he had "carte blanche" to change items in the submittals[2] without prior approval—which the contract's terms contradicted—as further evidence to vindicate its decision to terminate.  Def.'s Opp. & Cross Mot. 19.

In opposition, Bunting attempts to undermine the evidence MHJV offered in support of its motion, arguing the affidavits from Mack and Baker contain merely subjective opinions of Bunting's performance, not the requisite undisputed facts for a summary judgment motion.  Pl.'s Reply 6, ECF No. 90-1.  Pushing back on MHJV's assertion that Joshua Bunting testified he had "cart blanche" to substitute parts as he saw fit, Bunting stresses that the testimony only admitted to having discretion to change submittals that were not feasible so long as performance requirements remained the same.  Pl.'s Reply. 8 (citing Ex. 16 to Def.'s Opp., Bunting Dep. 167–68, ECF No. 85-17).

Bunting also argues that absent termination, it would have been provided with an opportunity to cure any issues associated with its performance.  Pl.'s Reply 10; Ex. A to Pl.'s Mot.

---

[2]     The "submittals" here consist of shop drawings, samples, and calculations sent to the Architect and Contracting Officer for approval and to ensure the submittals complied with the contract requirements.  Def.'s Opp. & Cross Mot. 4; Ex. 21 to Def.'s Mot. at 4, ECF No. 85-22 (Submittal Procedures).  Under § 1 of the contract between MHJV and Bunting, Bunting was charged with adhering to these contract documents.  Ex. A to Pl.'s Mot. §§ 1.1.1, 1.3.

§ 2.13.1.  Failure to provide Bunting with this opportunity violated MHJV's obligation to "refrain from doing anything that will . . . frustrat[e] the right of the other party to receive the fruits of the contract between them."  Pl.'s Reply 11 (citing *Questar Builders Inc. v. CB Flooring, LLC*, 978 A. 2d 651, 675 (Md. 2009)).

As to the opportunity to cure, MHJV insists that it *did* provide this opportunity to Bunting, but that Bunting refused to take advantage of it.  Def.'s Reply 11, ECF No. 91 (citing Mack Aff. ¶¶ 9-13, 23).  When MHJV insisted on a cure for the Tapcon screws, Bunting instead asserted they would work just as well, citing an opinion from their engineer.  Bunting similarly refused to cure the plaza rails.  Def.'s Reply 11 (citing Ex. 5 to Def.'s Mot.).

Having considered the parties' dispute over to the proper standard governing the termination in this case, I find the following.   Under Maryland law, which the parties agree governs, Pl.'s Mot. 6; Def.'s Opp. & Cross. Mot. 16, where a contract conditions continued performance on the satisfaction of a party—the case here, under § 9.1 of the contract—the "exercise of judgment [by the party to be satisfied] must be in accordance with the duty of good faith and fair dealing" to preclude the contract from being rendered illusory.  *Sky Angel U.S., LLC v. Discovery Commc'ns, LLC*, No. CIV.A. DKC 13-0031, 2013 WL 3465352, at *5 (D. Md. July 9, 2013), *aff'd* 885 F.3d 271 (4th Cir. 2018) (citing Restatement (Second) Contracts § 228 cmt. a (1981); *Questar Builders, Inc. v. CB Flooring, LLC*, 978 A.2d 651, 670 (Md. 2009)).   The assessment of good faith depends on the type of contract at issue; for contracts (such as the one here) that relate to mechanical fitness or utility, an objective standard applies.  *Sky Angel*, 2013 WL 3465352, at *5–6 (citations omitted).   In certain other contexts, such as those regarding personal taste, a subjective standard applies that assesses honest satisfaction of the party to be satisfied.  *Id.*  To the extent there is any ambiguity about whether the objective test applies, courts

prefer the objective test; I find that is the correct test to apply here because the dispute centers on mechanical fitness of various building components. *Volos, Ltd. v. Sotera*, 286 A.2d 101, 109 (Md. 1972); *see also* Restatement (Second) Contracts § 228, cmt. b (expressing a general preference for an objective standard). The question under the objective standard is whether a reasonable person in the position of the party to be satisfied—here, MHJV—should have been satisfied. *Sky Angel*, 2013 WL 3465352 at *6 (citing *First Nat'l Realty*, 233 A.2d 815). Further, the party to be satisfied must act in accordance with the reasonable expectations of the other party. *Id*. (citing *Questar*, 978 A.2d at 676).[3]

The *Questar* court offered additional guidance, instructing that the party exercising its discretion, such as to terminate, cannot do anything that effectively frustrates "the right of the other party to receive the fruits of the contract between them." *Questar*, 978 A.2d at 675 (citations omitted). Rather, it must act "in accordance with the reasonable expectations of the other party," as stated in the terms of the parties' agreement. *Id.* at 675–76. Failure to do so would be arbitrary and capricious, and would "vitiate[] the quality of the reasonableness" of the decision to terminate." *First Nat'l Realty*, 233 A.2d 815. Finally, as the Fourth Circuit has observed, the issue of good faith is a question of fact. *Sky Angel U.S., LLC v. Discovery Commc'ns, LLC*, 885 F.3d 271, 276–77 (4th Cir. 2018) (citing *David A. Bramble, Inc. v. Thomas*, 914 A.2d 136, 149 (Md. 2007)).

---

[3]    The parties each touch on the burden of proof in their reply briefs. Bunting, after arguing that I should not assess this case under the good faith and fair dealing standard that I have found applies, relies on cases from the Court of Federal Claims to argue the entity issuing the default bears the burden of justifying the default. Pl.'s Reply 12 n.3. MHJV, on the other hand, argues Bunting must establish a prima facie of bad faith case to prevail and cannot do so. Def.'s Reply 12–14. *Questar* provides guidance, observing the subcontractor alleging that termination for convenience was in bad faith must first make a showing of bad faith; upon doing so, the issue of good faith is in play and the Contractor must prove by a preponderance of the evidence that its decision to terminate was in good faith. *Questar*, 978 A.2d at 675 n.25.

Preliminarily, Bunting argues that MHJV's evidence consisted merely of subjective opinions from Mack and Baker stating Bunting did not comply with the contract. Pl.'s Reply 6. But Bunting has failed to provide authority to back up its assertion that I should not consider these affidavits. Further, the summary judgment rule unambiguously contemplates consideration of affidavits and declarations, Fed. R Civ. P. 56(c)(1)(A), and here, I find that Bunting has failed to refute the sworn content of the affidavits it suggests I should not consider. The evidentiary value of the affidavits depends on whether the facts presented in them are in a form that would be admissible in evidence. Fed. R. Civ. P. 56(c)(2). Since Fed. R. Evid. 701 and 702 both permit opinion testimony—from lay witnesses if based on sufficient perceived facts that are helpful to the fact finder (Rule 701), and opinions from individuals with expertise in scientific, technical, or specialized matters, if based on sufficient facts and reliable methodology (Rule 702)—Bunting's effort to undermine the value of the affidavits supporting MHJV's motion is misplaced. Moreover, in addition to the affidavits, MHJV has offered numerous business records, admissible under Fed. R. Evid. 803(6), to substantiate its arguments.

Next, because the correct standard here is adherence to the duty of good faith and fair dealing, MHJV's decision to terminate Bunting for default met that standard for the following reasons. First, the undisputed facts demonstrate that Bunting deviated from the terms of the contract in several material respects. The contract required strict adherence to the "Contract Documents," Ex. A to Pl.'s Mot. at 4 (§ 1.3), and Bunting failed to meet this obligation. Bunting admits that the plaza rails it installed did not meet aesthetic requirements. Pl.'s Reply 7. Bunting also admits that it did not install hot-dipped galvanized rails, Pl.'s Mot. 15, opting instead for rails painted with a red oxide primer, *id.*; Baker Aff. ¶ 16. This decision deviated from the requirement that Bunting install hot-dipped galvanized plaza rails; there is no material dispute on this point.

While Bunting argues its decision did not adversely affect the performance requirements, Bunting does not dispute the rail suffered from defects shortly after installation such as peeled paint and rust.  Baker Aff. ¶ 16.  Nor does Bunting dispute that hot-dipped galvanized rails were required under the contract and related documents.  Ex. 15 to Def.'s Opp. & Cross. Mot., ECF No. 85-16 at 2.  Thus, MHJV has several legitimate reasons to be dissatisfied with Bunting's performance as to the plaza rails.

As to the Tapcon screws for the shear wall rails in the parking garage, the record is similarly undisputed that use of Tapcon screws violated the contract.  At no point did MHJV approve the Tapcon screws.  Def.'s Opp. & Cross Mot. 12; Mack Aff. ¶ 28.  While Bunting argues that the Tapcon screws were approved by an engineer, Ex. M to Pl.'s Mot. at 7, ECF No. 82-15 (noting "Plate OK By Inspection"), the approval document noted "1/2' Diameter Expansion Anchor 4" Long," Baker Aff. ¶ 20; Ex. 20 to Def.'s Mot. 1, ECF 85-21, but the Tapcon screws were only ¼ inch screws with less penetration into the shear walls.  MHJV informed Bunting of this issue in a February 29, 2016 notice to cure letter, explaining that the Tapcon screws were not an expansion anchor and "cannot achieve the typical embedment of 3½ inches called for in the approved shop drawing."  Ex. 6 to Def.'s Mot. 1.  Unfazed, Bunting refused to cure the issue, *see* Ex. 16 to Def.'s Mot. at 163 (Bunting Dep.), and MHJV eventually paid another subcontractor to replace the Tapcon screws.  Baker Aff. ¶ 21.  And even though Bunting submitted a letter from a third-party engineer regarding the propriety of using Tapcon screws, this submission occurred after MHJV issued Bunting a notice to cure.  Mack Aff. ¶ 30.  This adds to the reasonableness of MHJV's dissatisfaction.

There is a similar story when it comes to the exam light supports in the dental exam rooms. Bunting elected to used "screws in lieu of bolts" and failed to install the Unistrut (a metal framing

system) "in accordance with the shop drawings."   Baker Aff. ¶ 24; Ex. 7 to Def.'s Mot. 3 (Termination Letter).   While Bunting tries to pass the issue off as one anyone could cure with a wrench, Pl.'s Mot. at 18 n.7, the installation shortcoming only adds weight to MHJV's conclusion it lacked confidence in Bunting's performance.[4]

The most convincing evidence in the record to support MHJV's motion is Bunting's refusal to comply with MHJV's requests to cure the deficiencies MHJV identified.   On February 20, 2016, MHJV demanded that Bunting cure the plaza rails so that the finished product would comply with contract requirements.   Ex. 4 to Def.'s Mot. 1.[5]   Specifically, the notice to cure detailed the requirement that the rails be galvanized and directed Bunting to provide a plan to cure the issue within 48 hours or risk having MHJV "take all necessary steps to supplement" Bunting's work. Similarly, on February 29, 2016 MHJV issued a notice to cure as to the Tapcon screws.   Ex. 6 to Def.'s Mot. 2.   The notice explained the deficiencies associated with the Tapcon screws and directed Bunting to cure the deficiencies "or to be in default" in accordance with § 9.1 of the Subcontract.   *Id*.   Bunting declined.   Baker Aff. ¶ 18 (plaza rails), ¶ 21 (Tapcon screws).

Returning to the standard governing termination of a contract, it is beyond dispute that MHJV adhered to the duty of good faith and fair dealing in deciding to terminate Bunting's contract for default.   MHJV reasonably expected strict adherence to the terms of the contract, Ex. A to Pl.'s Mot. § 1.3, and, under Maryland law, a subcontractor cannot re-write the terms of a contract for its own benefit, *see Questar*, 978 A.2d at 670 ("[a]n unlimited right to determine how

---

[4]      MHJV suggests this lack of confidence forward-looking, considering the termination occurred after Phase 1.   Additional work, including Phase 2, remained and MHJV lacked confidence that Bunting would adhere to the terms of the contact for its subsequent obligations. *See* Def.'s Opp. & Cross Mot. 19; Baker Aff. ¶ 28.
[5]      The exhibit is erroneously dated February 20, 2015.   It is clear from the letter's content that the correct date is February 20, 2016.

to perform, or whether to perform at all, negates the promise to perform."). Based on Bunting's repeated failures to abide by the contract requirements and its admissions to several of the issues MHJV cited as a basis for termination, no reasonable trier of fact could conclude Bunting did anything other than breach the terms of the contract, to which it was obligated to strictly adhere. Further, I find that no reasonable contractor in MHJV's position should have been satisfied with Bunting's performance. Adding to the finding that MHJV acted in good faith, MHJV did nothing to hinder Bunting's right to the fruits of the contract: MHJV cited the specifications Bunting violated and, in accordance with the terms of the contract, gave Bunting an opportunity to cure its shortcomings. *Questar*, 978 A.2d at 675.

Courts find parties do not act in good faith when they subvert terms of a contract to escape their obligations. In *WSC/2005 LLC v. Trio Ventures Assocs.*, the Maryland Court of Appeals held a party that sold real estate rather than use commercially reasonable efforts to re-lease the property did not follow "its obligation to use commercially reasonable efforts to re-lease the buildings," thus acting in bad faith. 190 A.3d 255, 268 (Md. 2018); *see also Clancy v. King*, 954 A.2d 1092, 1109 (personal spite would constitute bad faith). Here, the opposite occurred: Bunting refused to uphold its end of the contract but tries to argue it did not receive the full benefit of the contract. Nonsense. MHJV provides the correct standard, under which it is entitled to summary judgment.

*Bunting's Motion*

As stated previously, courts must assess cross motions for summary judgment independently. *Lynn v. Monarch Recovery Management, Inc.*, No. WDQ-11-2824, 2013 WL 1247815, at *1 n.5 (D. Md. Mar. 25, 2013). Accordingly, I will do so here and will proceed to decide Bunting's motion for summary judgment, though I note that the issues are largely repetitive of MHJV's motion, and therefore already have been discussed.

14

Bunting first argues that MHJV's grounds for terminating the contract were not justifiable. As an initial matter, Bunting cites Maryland Court of Appeals decisions to support the proposition that to justify terminating a contract, a party's breach must be material.  Pl.'s Mot. 9 (citing *Prescon Corp. v. Savoy Constr. Co.*, 267 A.2d 222 (Md. 1970); *Shade v. State*, 509 A.2d 664 (Md. 1986); *Regal Savings Bank v. Sachs*, 722 A.2d 377 (Md. 1999)).  In Bunting's view, any breach here is indisputably immaterial because Bunting substantially performed, completing its work up to the point of a few remaining "punchlist" items.  *Id.*  Making it to the punch list stage, Bunting argues, means it rendered substantial performance and is therefore entitled to recover for the work it performed minus actual damages for any work remaining.  *Id.*  (citing *Speed v. Bailey*, 139 A. 534, 537 (Md. 1927)); *id.* at 10 ("Substantial performance is achieved at the point of punchlist production even though punchlist items may remain.") (citing *Continental Ill. Nat. Bank & Trust Co. v. United States*, 101 F. Supp. 755, 758 (Ct. Cl. 1952)).  Bunting suggests that the circumstances here resemble those at issue in *First Nat. Realty Corp. v. Warren-Ehret Co.*, 233 A.2d 811, 813–14 (Md. 1967) where the Maryland Court of Appeals held a subcontractor that had substantially performed could not be terminated for default.  Pl.'s Mot. 11.

Bunting next argues that the reasons MHJV gave to justify terminating Bunting were immaterial and thus could not justify termination.  Pl.'s Mot. 12.  Those reasons, discussed above, were 1) alleged insufficient manpower, 2) improper installation of plaza rails, 3) improper installation of shear wall rails, and 4) improper installation of dental light supports.  Ex. F to Pl.'s Mot., ECF No. 82-7.  As to the manpower issue, Bunting argues MHJV has failed to show any

detailed basis for this allegation and that MHJV admitted it lacks an analysis to show Bunting had an adverse effect on the project.  Pl.'s Mot. 13 (citing Ex. K to Pl.'s Mot., ECF No. 82-13).[6]

As to the plaza rails, which MHJV alleged were of lower quality than those required in the contract, Bunting argues that due to a prior subcontractor's delay, it requested additional time relative to the Beneficial Occupancy Date to install the proper rails.  Pl.'s Mot. 15.  When MHJV refused to respond to the request and threatened liquidated damages, Bunting proceeded to install coated rails rather than the hot-dipped galvanized rails the specifications called for.  *Id.*; Ex. F to Pl.'s Mot. at 3.  The circumstances justified this deviation, Bunting states, and the final product met the quality and performance requirements.  *Id.*

Next, Bunting states the Tapcon screws used to install shear wall rails in the parking garage were in fact approved after an inspection and cites an approved shop drawing that included the Tapcon screws.  Def.'s Mot. 16–17; Ex. M to Pl.'s Mot.  Bunting also cites approval from Rice Engineering, a third-party engineer, as to the use of Tapcon screws, which it suggests undermines the legitimacy of MHJV's opposition to the installation method.  Pl.'s Mot. 17; Ex. N to Pl.'s Mot., ECF No. 82-16.

Finally, as to the Dental Light Supports, Bunting argues this issue that MHJV cited in support of termination was not significant enough to be included in the final punch list.  Pl.'s Mot. 17–18; Ex. E to Pl.'s Mot. (punch list), ECF No. 82-6; Ex. F to Pl.'s Mot.  Apparently, Bunting states, the supports were not tightened sufficiently.  The termination letter notes that the light

---

[6]     The motion did not cite to a specific portion of Exhibit K, rather, it stated "*see*, Exhibit "K"' in its brief.  MHJV's answer to interrogatory 18 at page 27 (based on the Court's CM/ECF pagination) states "MHJV has yet to determine the overall impact and delay costs associated with BGI's delays."  MHJV also objected to Bunting's request for "any and all Documents and Communications related to any alleged delays on the Project."  *Id.* at 35.

supports had "screws in lieu of bolts and the unistrut had not been installed in accordance with the shop drawings."  Ex. F to Pl.'s Mot. at 4.

These reasons for termination, Bunting argues, are entirely immaterial and cannot vindicate MHJV's decision to terminate Bunting for default.  Further, whatever the issues with Bunting's performance, they did not delay completion of the project.  Pl.'s Mot. 19; Ex. K to Pl.'s Mot.  But the adverse consequence of the termination, in Bunting's view, was its being deprived of the opportunity to remedy the issues MHJV cited in its termination letter, an opportunity that the parties' contract provided to it.  Pl.'s Mot. 19; Ex. A to Pl.'s Mot., at § 2.4.1, § 2.13.1.

Since MHJV cannot satisfy its burden to show that the termination was proper, Bunting argues the termination must be converted to one for convenience.  Pl.'s Mot. 21 (citing *Lanterman v. United States*, 75 Fed. Cl. 731, 733 (2007); *Keeter Trading Co., Inc. v. United States*, 79 Fed. Cl. 243, 262 (2007)).  Sections 9.3 and 10 of the parties' contract govern termination and states that if Bunting is terminated without sufficient justification, it is entitled to the reasonable value of work performed before termination along with close-out costs.  Ex. A to Pl.'s Mot. at §§ 9.3, 10.  According to Bunting, this totals $1,181,797.43.

In opposition, MHJV first argues that Bunting has failed to produce any evidence to support its entitlement to summary judgment.  Def.'s Opp. & Cross Mot. 16 (citing Fed. R. Civ. P. 56(c)).  MHJV states Bunting has failed to introduce any affidavits, deposition testimony, or other "competent evidence" to present a genuine factual dispute.  Rather, Bunting relies purely upon "unsworn and unauthenticated" documentation to support its motion, as well as documents that contain inadmissible hearsay.  *Id.* at 16–17 (citing *Greensboro Pro. Fire Fighters Ass'n, Local 3157 v. City of Greensboro*, 64 F.3d 962, 967 (4th Civ. 1995)).  Further, the deposition testimony that Bunting provided actually undermines its entitlement to summary judgment, in MHJV's view.

The opposition notes a deposition from Bunting's president, Joshua Bunting, who testified that he thought he "absolutely [did] not" have to get approval to deviate from "an approved shop drawing or specification." Def.'s Opp. & Cross Mot. 16; Ex. 16 to Pl.'s Mot. at 161 (Bunting Dep.).

Next, MHJV derides Bunting for using the wrong standard regarding contract termination. The contract at issue specifically gave MHJV the right to terminate based on MHJV's own "opinion" of a subcontractor's work. Def.'s Opp. & Cross Mot. 17; Pl.'s Ex. A, § 9.1. The correct standard, MHJV argues, comes instead from *H&R Block v. Garland*, 359 A.2d 130, 134 (Md. 1975), which held that termination is proper so long as an employer's dissatisfaction is honest and not pretextual. MHJV notes that even *Warren-Ehret*, the case upon which Bunting relies, allows for termination of a subcontractor so long as the termination is not arbitrary, capricious, or in bad faith.

As to Bunting's argument that substantial performance precludes termination in this case, MHJV distinguishes the case upon which Bunting relies, *Prescon*, by noting the contract at issue there lacked a cancellation clause like the one in the contract here. Def.'s Opp. & Cross Mot. 19; Ex. A, § 9.1. Further, the contract here did not preclude termination upon substantial performance, nor did rightful termination hinge on materiality of the breach. Def.'s Opp. & Cross Mot. 19. Factually, MHJV also highlights the expenses it incurred to complete Bunting's unfinished work, which totaled over $900,000, an amount which is far from immaterial. *Id*. at 19–20; Baker Aff. ¶ 29. And MHJV distinguishes much of the authority upon which Bunting bases its motion because the cases Bunting cites did not concern termination. MHJV focuses in particular on the Maryland Court of Appeals' decision in *Warren-Ehret*, and distinguishes the holding there that the contractor's decision to terminate was arbitrary: MHJV points to the court's reliance on facts outside of the subcontractor's control that led to the breach (such as a torrential downpour and

18

subsequent flood), which rendered the decision to terminate arbitrary.   233 A.2d at 816.
Conversely, here, Bunting's performance deficiencies were entirely of their own making.

Bunting's Reply first takes issue with MHJV's argument that Bunting's motion was
unsupported by competent evidence, arguing that it relied on contemporaneous project records and
noting MHJV failed to offer specific challenges to any of Bunting's evidence.  Pl.'s Reply 2.  In
an effort to remedy the issue, Bunting submitted an affidavit from Joshua Bunting with its reply
that formally authenticates the records in support of Bunting's motion for summary judgment.[7]
*Id*.

As to termination, Bunting suggests the contract here contained "two distinct termination
clauses," which MHJV's motion ignores.  *Id*. at 3.  Considering contracts are to be read in the
context of the entire agreement, *id*. at 4 (citing *Rourke v. Amchem Prods., Inc.*, 835 A.2d 193, 210
(Md. Ct. Spec. App. 2003)), Bunting argues that  the language in the contract here—Sections 9.1
and 9.3—provided MHJV with the ability to terminate the contract but, under § 9.3, but modified
a wrongful termination to one for convenience, rather than default, Pl.'s Reply 4–5.  Bunting
reiterates its argument from its initial motion that because Bunting substantially performed,
MHJV's termination must be considered wrongful.  *Id*. at 5.

My analysis of Bunting's motion has largely been resolved above based on my finding that
*Questar*'s good faith and fair dealing standard applies.  *Supra* at 9.  But some important issues
remain.  First, regarding Bunting's argument that substantial performance precludes its termination
here, I note that MHJV is correct that no provision of the contract afforded Bunting protection
from termination upon substantially performing.  And the case Bunting cites, *Speed v. Bailey*, is

---

[7]     MHJV cites several issues with the affidavit, including that it affirms only the authenticity
of the documents accompanying Bunting's memorandum, not the truth or statements made therein.
Def.'s Reply 5.  MHJV also alleges the affidavit fails to cure hearsay issues in the documents.

unconvincing as applied to the circumstances here.  *Speed* concerned rescission of a contract for construction of a home after the specifics of the contract had been modified orally.  *Speed v. Bailey*, 139 A. 534, 535–36 (Md. 1927).  Rescission concerns the "unilateral unmaking" of a contract; it is an equitable remedy that nullifies the entire contract and puts the parties back to the position they were in prior to the contract's formation.  Black's Law Dictionary (11th ed. 2019), *Matzelle v. Pratt*, 332 F. Supp. 1010, 1012 (E.D. Va. 1971).  Here, the issue is termination, which Black's defines, simply, as "the act of ending something," or, as it pertains to termination of a conditional contract, "the act of putting an end to all unperformed portions of a conditional contract."  Black's Law Dictionary (11th ed. 2019).  The latter definition is particularly applicable here and, under the parties' contract, leaves unresolved the matter of damages. Instead of putting the parties in the positions they were in prior to entering the contract, this case must proceed to trial to resolve damages.

Second, Bunting's reliance on *Warren-Ehret* is unpersuasive.  While the Maryland Court of Appeals held the termination there was arbitrary after the subcontractor had substantially performed, the reason for voiding the termination was not due to substantial performance.  Rather, the court held the decision to terminate was arbitrary because the termination followed a flood that inundated the building that was the subject of the contract.  *Warren-Ehret*, 233 A.2d at 816. Further, the subcontractor there had complied with the terms of the contract; that is not the case here.

A final point I must address is Bunting's argument that MHJV refused to respond to Bunting's request for additional time to install the plaza rails.  Even if this occurred, Bunting still refused to comply with the notices to cure MHJV issued and thereby fell short of  its obligations under the contract. Baker Aff. ¶¶ 8, 18.  Bunting's outright refusal to engage in any remediation

after being notified of its contractual failings is both fatal to its own motion and a significant justification for granting MHJV's, as is Bunting's failure to present any evidence of bad faith on MHJV's part. *See e.g.* Ex. 16 to Def.'s Mot. p. 215, Bunting Dep., ("I think the allegations in [the termination letter] are patently false, but I believe that, you know, they terminated for what they said they terminated for.").

For the reasons stated above, I find Bunting's efforts to refute MHJV's explanation for termination are without merit and that the termination here should not be converted to one for convenience.

## Conclusion

For the foregoing reasons, MHJV's motion for partial summary judgment is GRANTED and Bunting's motion for summary judgment is DENIED.  A separate order follows.

DATED this 31st day of March, 2021.

BY THE COURT:

_____/S/_____
Paul W. Grimm
United States District Judge